IN THE UNITED STATES FEDERAL COURT
IN AND FOR THE MIDDLE DISTRICT
TAMPA, FLORIDA


RUSSELL ROGERS,

        Plaintiff

v.                             Case No.: 8:07-CV-01705-T26 EAS

GRADY JUDD, IN HIS OFFICIAL CAPACITY
AS SHERIFF FOR POLK COUNTY, FLORIDA,
PATRICK RENNEY,
SANDRA BARRETT, and
RONALD ODOSKI,

        Defendants.

_____/

### PLAINTIFF'S MEMORANDUM OF LAW  AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW plaintiff, RUSSELL ROGERS, by and through his undersigned attorney, and files this memorandum of law and responds to the Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and states as follows:

### STANDARD OF REVIEW

Summary judgment is proper only when the evidence before the court establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. **56**(c); see also Skrtich v. Thornton, **280 F.3d 1295, 1299** (11th Cir. 2002). All evidence must be viewed in the light most favorable to the nonmoving party. Skrtich, **280 F.3d at 1299**.  See also, Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). That is, courts must construe the facts and draw all inferences in the

light most favorable to the nonmoving party and "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*." Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff, Skrtich, **280 F.3d at 1299**.

The facts presented in the Defendants' Motion for Summary Judgment contain facts not necessary for rendering a ruling on the motion for summary judgment in that they are designed to prejudice the Plaintiff's cause because the facts are presented in the light most favorable to the Defendants.  Based upon the foregoing case law, the following facts are the facts to be utilized for the purposes of summary judgment.

## FACTUAL BACKGROUND FOR PURPOSES OF MOTION

### *Pre-incident abuses by Detention Deputies*

Prior to this incident giving rise to inmate Rogers's civil rights violations, both Sgt. Barrett and Detention Deputy Odoski were involved in another excessive force scenario.  (Barrett depo, p. 29, I. 19).  In fact Sgt. Barrett has been involved in multiple internal affairs investigations prior to this incident. (Barrett depo, p. 29, I. 9).  More particularly, both Sgt. Barrett and D/D Odoski were involved in the same internal affairs investigation in which Sgt. Barrett, a supervising officer, was accused of using excessive force on an inmate as well as omitting material information from her report (i.e. the omission was the striking of the inmate Brian Digrazia). (Barrett depo, p. 29, line 23 – p. 30, line 23).  Both of the allegations against Sgt. Barrett were founded, yet Sgt. Barrett was able to

maintain her position as a superior officer.  (Barrett depo, p. 29, line 23 – p. 33, line 20).  Sgt. Barrett claims that she was never named as a defendant in any prior litigation.  (Barrett depo, p. 34, line 11).  However, the truth of the matter is that both Sgt. Barrett and D/D Odoski were previously named defendants in another excessive force case in the Circuit Court in and for Polk County, *Horace Lee Hunter, Sr. v. Sgt. Barrett, D/D Odoski, Polk County Sheriff's Office, et al.* case number 2001CA-000974.

### *Incident with Noble*

Earlier in the day, Russell Rogers was involved in a physical altercation with Detention Deputy (D/D) Noble when inmate Rogers was refused access to the jail chaplain.  (Rogers depo, p. 19, lines 1-11).  Inmate Rogers and D/D Noble exchanged words regarding the incident which ultimately resulted in D/D attacking inmate Rogers from behind as Rogers walked away.  (Rogers depo, p. 19, line 15).  Ultimately, both D/D Noble and inmate Rogers were involved in a physical altercation which had to be broken up when D/D Suppinger sprayed OC spray into inmate Rogers' eyes.  (Rogers depo, p. 26, lines 8-24).   At which point, inmate Rogers fell to the ground, laid on his stomach, and was handcuffed behind his back.  (Rogers depo, p. 29, line 24 – p. 30, line 1).   Once maced in the eyes, inmate Rogers complied with the requests of the detention deputies. (Rogers depo, p. 30, line 20).  Inmate Rogers was then taken to the medical unit for a protective action examination.  (Rogers depo, p. 32, line 6).

*Incident giving rise to Civil Rights violations*

Inmate Rogers was taken to the medical dorm by D/D Odoski, D/D Renney, and Sgt. Barrett.  Rogers depo, 33, line 11. Sgt. Gordon Brown also escorted inmate Rogers to the medical dorm.  (Odoski depo, p.10 l. 24).  Also, present in the medical dorm was Detective Davis who came to take photographs only of D/D Noble.  (Odoski depo, p. 12, l. 11-22).  D/D Odoski is 6 foot 2 inches tall and weighs 243 pounds. (Odoski depo, p. 40 l. 4).  D/D Renney is 5 foot 6 inches tall and worked out with weights three to four times a week. (Renney depo, p. 38 lines 3 -17) Sgt. Barrett is 5 foot 5 inches tall and weighs 210 pounds. (Barrett depo, p. 33 lines 9-13).

When inmate Rogers taken into the medical dorm nurses Lori Murphy and Michelle O'Neil were present, as well as a mental health personnel, Melissa Ventura, with a female inmate.  (Rogers depo, p. 38, line 9 – p. 40, l. 24, and Ventura depo, p. 8 l. 12-18 ).   Nurse O'Neil performed a pre-confinement evaluation on inmate Rogers, and at no time did inmate Rogers see D/D Noble. (Rogers depo, p. 38, line 15 and p. 43, line 16).  After inmate Rogers was seen by Nurse O'Neil he was placed into the corner of the room while the isolation dorm was being cleared out.  (Rogers depo, p.44, line 13 and Ventura depo, p. 10 l. 2).   Inmate Rogers was still handcuffed behind his back during this time period.  (Rogers depo, p. 44, line 19).

D/D Odoski then approached inmate Rogers from behind and stated "the inmate is the one suppose to go to the hospital" and then grabbed inmate Rogers thumbs and began to bend his thumbs.  (Rogers depo, p. 45 l. 8).  Ventura also

heard the detention deputies state "if one of our guys are hurt then or going to the hospital, you're going to be following in an ambulance." (Ventura depo, p. 14, l.9). This statement was in response to D/D Noble being sent to the Bartow Memorial Hospital for medical treatment as a result of the earlier physical altercation. (Odoski depo, p. 21 l. 16). When inmate Rogers closed his hand to prevent any harm by D/D Odoski to his thumbs, D/D Odoski then grabbed inmate Rogers by the head and began slamming inmate Rogers' head into the concrete wall. (Rogers depo, p. 45, l. 18 and Ventura depo, p. 13, l. 20). Inmate Rogers' handcuffed arms were then raised in the air causing him severe arm pain while inmate Rogers' legs were kicked down below. (Rogers depo, p. 45, l. 18 and Ventura depo, p. 15, l.2). Rogers' head was bashed into the wall multiple times by D/D Odoski. (Rogers depo, p. 47, l. 20 and Ventura depo, p. 16, l. 10). Inmate Rogers turned his head at one point to see both D/D Odoski and D/D Renney immediately behind him, while Sgt. Barrett stood by five feet away and did nothing but watch. (Rogers depo, p. 46, lines 20 – p. 47, line 3). D/D Renney was the one kicking Rogers' legs b/c there was no way for D/D Odoski to slam Rogers' head and raise up handcuffs while simultaneously kicking Rogers' legs. (Rogers depo, p. 52, line 13-20). Ventura witnessed one detention deputy raising up inmate Rogers' arms by the handcuffs while the other detention deputy was hitting his head against the concrete wall. (Ventura depo, p. 16, l.1). During that time period of abuse, Ventura never saw inmate Rogers resist the detention deputies at all, in fact Ventura saw inmate Rogers simply stand there and accept the abuse he was receiving. (Ventura depo, p. 15, l.2). The detention deputies

were trying to aggravate inmate Rogers to provoke him but inmate Rogers did not respond to the detention deputies taunting.  (Ventura depo, p. 17, l. 25). Soon after the beating began on inmate Rogers, Nurse O'Neil came over to shut the curtain so Ventura could not see the abuse that was occurring on inmate Rogers.  (Ventura depo, p. 14, l. 5).  Inmate Rogers told the detention deputies that he was "going to sue them" in order to get the detention deputies to stop the abuse.  (Rogers depo, p. 46, l. 3, Ventura depo, p. 16, l. 16, and Odoski depo, p. 39 l. 16).   D/D Odoski responded "who is going to believe a piece of shit like you?" as D/D Odoski continued slamming Rogers head into the wall and hiking up Rogers' handcuffed arms (Rogers depo, p. 46, l. 9 and Ventura depo, p. 16, l. 17).   Ventura then pulled back the curtain and said "Excuse me!", at which point Nurse O'Neil came over to escort both Ventura and inmate Jenna Wood out of the medical dorm into a different location so that Ventura and Wood could no longer witness the abuse.  (Ventura depo, p. 16, lines 19- 21).  As Ventura was being ushered out, another unknown detention deputy came into the medical dorm as stated that inmate Rogers was going behind D/D Noble in an ambulance.  (Ventura depo, p 17, l. 18).

Once the isolation cell was cleared out, D/D Odoski, D/D Renney, and Sgt. Barrett escorted inmate Rogers from the medical dorm to the isolation cell. (Rogers depo, p. 79, l. 1).  D/D Odoski escorted inmate Rogers while holding up his handcuffed arms to the point where inmate Rogers was bent over and holding up his arms in a crouched over position.  (Rogers depo, p. 79, l. 7 – p. 80, l. 19). As soon as they entered the isolation cell, both D/D Odoski and D/D Renney

threw inmate Rogers on the ground, kneed Rogers in the back and hit him while Rogers was still handcuffed behind his back. (Rogers depo, p. 79, l. 11)  D/D Renney was kneeing inmate Rogers in the back while D/D Odoski held inmate Rogers head to the floor.  (Rogers depo, p. 82, l. 7-25).  As a direct result of the additional abuse, inmate Rogers did not have any feeling in his arm.  (Rogers depo, p. 84, l. 25).  Shortly thereafter Sgt. Barrett ordered a strip search of inmate Rogers.  (Rogers depo, p. 84, l. 1).  Sgt. Barrett stood and watched the strip search despite being a female detention deputy.   (Rogers depo, p. 85, l. 15).

### *Injuries from incident*

Interestingly, before inmate Rogers arrived at the medical dorm he had no injuries.  (Renney depo, p. 19, line 13 and Odoski depo, p. 13, l. 19). However, after the incident Dr. Enriquez treated inmate Rogers at the jail who immediately treated inmate Rogers face and arm by providing a sling, and then referred inmate Rogers to Bartow Memorial Hospital for emergency treatment.  (Rogers depo, p. 91 l. 3-10).

Rogers thought his arms were broken because while his arms were being raised by D/D Odoski he heard a popping noise.  (Rogers depo, p. 55, line 5). Afterwards from his elbow down to his wrist, inmate Rogers arm was swollen and could not move his right arm.  (Rogers depo, p. 55, l. 11).  Inmate Rogers had to wear a sling for his right arm for approximately 1-2 months while being constantly prescribed medication for the pain.  (Rogers depo, p. 56, l. 14).   To this day

almost five years later, inmate Rogers still experiences periodic pain and numbness and tingliness in his right arm.  (Rogers depo, p. 57, lines 2-12).

After the incident, inmate Rogers had skin missing from his face from where his face was slammed into the concrete wall.  (Rogers depo, p. 61, l. 16). In addition, inmate Rogers left jaw condition was aggravated by the abuse to the extent that a jaw surgery had to be performed to prevent the "popping", "cracking", and the "wobbling" of his jaw as inmate Rogers spoke or ate.  (Rogers depo, p. 61, lines 16-18).  As a direct result thereof, inmate Rogers now has a scar running down his front of his ear.  (Rogers depo, p. 63, l. 8).   After the surgery, inmate Rogers was wearing a mouth guard for eight months up to the point his deposition was taken.  (Rogers depo, p. 70, l. 20)

### Post-incident failure to investigate

After witnessing the troubling incident, Ventura called the Polk County Sheriff's Office (PCSO) in order to report the abuse.  (Ventura depo, p. 19, l.20). Each of the three persons Ventura spoke with at the PCSO tried to discourage her from making the report.  (Ventura depo, p. 19, l.25).   One month later Ventura received a letter indicating that the internal affairs investigation was "unfounded".  (Ventura depo, p. 21, l. 3).   However, it turns out that an internal affairs investigation was never conducted by the PCSO.  (Odoski depo, p. 7, l. 13-16  , Renney depo, p. 13 l. 8, and Barrett depo, p. 32 l. 19).  Nurse O'Neil indicates that no one from the PCSO ever took a statement from her or even interviewed her to determine what occurred that day.  (O'Neil depo, p. 45, l. 15-

18).   The PCSO completely neglected its duty to investigate allegations of abusive officers.

## MEMORANDUM OF LAW

### *Section 1983 claims – individual Defendants*

The Defendants raise the defense of qualified immunity to the section 1983 claims against D/D Odoski, D/D Renney, and D/D Barrett.  In Saucier v. Katz, 533 U.S. 194 (2001), the United States Supreme Court established the method of analyzing qualified immunity.  A court should begin the analysis by asking whether a constitutional violation has occurred, and if so, then proceed to the issue of whether the defendant is entitled to qualified immunity because the right was not clearly established in the factual context of the case.  Thus, the first task for this Court to decide is whether a constitutional violation occurred.

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. Farmer v. Brennan, **511 U.S. 825, 832** (1994) (quoting Helling v. McKinney, **509 U.S. 25, 31** (1993)); see also Whitley v. Albers, **475 U.S. 312, 327** (1986) (holding that "the Due Process Clause  affords . . . no greater protection"). Although the Constitution does not require comfortable prisons, it does not permit inhumane ones. Farmer, **511 U.S. at 832** (quoting Rhodes v.Chapman, **452 U.S. 337, 349** (1981)).  Still, the Eighth  Amendment does not authorize judicial reconsideration

of "every governmental action affecting the interests or well-being of a prisoner,"
Whitley, **475 U.S. at 319**; instead, "'[a]fter incarceration, only the '"unnecessary
and wanton infliction of pain'". . . constitutes cruel and unusual punishment
forbidden by the Eighth Amendment. Id. at 319 (quoting Ingraham v. Wright, **430
U.S. 651, 670** (1977) (quoting Estelle v. Gamble, **429 U.S. 97, 103** (1976)
(citations omitted))). Crucial to establishing an "unnecessary and wanton infliction
of pain" is some proof that officials acted with specific intent. This specific-intent
requirement for an Eighth Amendment violation applies to both failure to provide
proper medical care, Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996), and
excessive force, see Whitley, 475 U.S. at 319-21. *See generally,* Campbell v.
Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999).

        In addition to defining the mental state required, Hudson and Whitley
outline five distinct factors relevant to ascertaining whether force was used
"maliciously and sadistically for the very purpose of causing harm": (1) "the
extent of injury"; (2) "the need for application of force"; (3) "the relationship
between that need and the amount of force used"; (4) "any efforts made to
temper the severity of a forceful response"; and (5) "the extent of the threat to the
safety of staff and inmates, as reasonably perceived by the responsible officials
on the basis of facts known to them." Whitley, **475 U.S. at 321**; see also Hudson,
**503 U.S. at 7**. Whitley also narrows the precise inquiry applicable when deciding
whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a
> mere dispute over the reasonableness of a particular use of
> force  or the existence of arguably superior alternatives.
> Unless it appears that the evidence, viewed in the light most

> favorable to the plaintiff, will support <u>a reliable inference</u>
> <u>of wantonness in the infliction of pain</u> under the standard we
> have described, the case should not go to the jury.

<u>Whitley</u>, **475 U.S. at 321** and <u>Campbell v. Sikes</u>, 169 F.3d at 1375.

Applying the <u>Whitley</u> 5-part test to the case at hand, it appears that the specific intent of the Defendants clearly establishes their intent to "maliciously and sadistically for the very purpose of causing harm".   The very fact that the Defendants stated before the abuse that inmate Rogers was going to go to the hospital shows that the Defendants intended to use excessive force upon inmate Rogers.   The testimony reveals that   D/D Odoski approached inmate Rogers from behind and stated "the inmate is the one suppose to go to the hospital" and then grabbed inmate Rogers thumbs and began to bend his thumbs.  (Rogers depo, p. 45 l. 8).  Similarly, Ventura heard the detention deputies state "if one of our guys are hurt then or going to the hospital, you're going to be following in an ambulance." (Ventura depo, p. 14, l.9).

The first prong looks to the extent of the injuries received by inmate Rogers.   The testimony reveals that inmate Rogers received emergency treatment at the Bartow Memorial Hospital immediately after the abuse.   Upon which the physician noted skin missing from Rogers' face, as well as requiring Rogers to wear a sling for his right arm for approximately 1-2 months.  Now some five years later, inmate Rogers is still prescribed medications for his arm complaints, and maintains pain, numbness, and tingliness on a regular basis.  As for his left jaw complaints, inmate Rogers incurred a surgery to cure the "popping", "cracking", and "wobbling" when inmate Rogers talks or eats.   After

the surgery, inmate Rogers had to utilize a mouth piece to secure his jaw in place for approximately eight months.   Again, some five years later, Rogers still endures problems with his jaw as a result of this incident.

The Defendant attempts to point out that inmate Rogers' injuries are de minimis, and therefore not worthy of merit.  It should be quickly be stated that if the Court adopts the Defendants' reasoning, then the Defendants egregious conduct will go unpunished.   This is true especially since the PCSO failed to conduct any internal affairs investigation.   In any event, the above stated facts demonstrate that inmate Rogers' injuries were not de minimis.   Moreover, the Eleventh Circuit Court summarized it best in Harris v. Garner.   More importantly, the Court clarified what was decided in the Campbell case.

> In light of the Hudson Court's rather fluid approach to what
> can constitute a cognizable injury under the **Eighth**
> Amendment, *see* Hudson, **503 U.S. at 9, 112 S.Ct. at 1000**
> (malicious and sadistic use of force is violative "whether or
> not significant injury is evident"), we have never held that a
> prisoner must allege a *physical* injury in order to make out a
> cognizable claim under the **Eighth** Amendment. Indeed,
> some of our cases suggest the contrary. *See, e.g.,* Campbell
> v. Sikes, **169 F.3d 1353, 1375** (11th Cir. 1999) (extent of the
> injury is one of the "factors" used in determining whether use
> of force was malicious and sadistic). We express no view on
> the issue today, and hold only that a prisoner must allege

more than a de minimis physical injury in order to satisfy the
requirement of section 1997e (e).

Harris v. Garner, 190 F.3d 1279,1287 (11th Cir. 1999).   The Defendants are
attempting to suggest that since inmate Rogers' head was not smashed open,
did not receive stitches to his head, go unconscious, or receive some type of
brain injury that inmate Rogers' injuries do not warrant a civil rights violation.  Not
only would that make poor public policy, it just is not the correct statement of law.
If unreasonable force was used upon an inmate (i.e. ramming their face into a
concrete wall multiple times while handcuffed behind their back and not
resisting), then just because the inmate does not receive "severe physical harm"
does not alleviate the officers from their unreasonable use of force.[1]  In other
words, just because the officers got lucky and the inmate did not receive serious
injury does not let the officers off the hook.   The Eleventh Circuit clarified this
position:

> In addition, the fact that Lee did not suffer greater injury to
> her head as a result of it being slammed against the trunk of
> a car does not alone render the force used *de minimis*. As
> this Court recently recognized in Rodriguez, "[w]e do not use
> hindsight to judge the acts of police officers; we look at what
> they knew (or reasonably should have known) at the time of
> the act." **280 F.3d at 1352-53**. Just as ordinary, reasonable
> force" does not become excessive force when the force
> aggravates(however severely) a pre-existing condition the
> extent of which was unknown to the officer at the time," *id.,*
> objectively unreasonable force does not become reasonable
> simply because the fortuity of the circumstances protected
> the plaintiff from suffering more severe physical harm.
> Slamming the head of a handcuffed, subdued arrestee
> against the trunk of a car is objectively unreasonable and
> clearly unlawful.

---

[1] Inmate Rogers still contends his injuries are "severe physical harm".

Lee v. Ferraro, 284 F.3d 1188,1200 (11th Cir. 2002)   .

The second prong in Whitley is whether there was a need for the application of force.   The testimony indicates that the physical altercation between inmate Rogers and D/D Noble had long passed.   Inmate Rogers was maced in his eyes and handcuffed behind his back.   D/D Noble was taken away from the scene and inmate Rogers was secured by three detention deputies.   At this point, there was no need for the detention deputies to use any force on inmate Rogers since the original situation had already ended, Rogers could not see, and could not utilize his hands to fight anyone else.   More importantly, the testimony reveals that inmate Rogers was not resisting in any fashion before or during the detention deputies smashing his face into the concrete wall, hiking up his handcuffed arms, kicking inmate Rogers, and bending his thumbs up.   In fact, Rogers was not saying anything to provoke the detention deputies attack. Ventura testified that inmate Rogers was simply standing there when the attack began and persisted.   These facts hardly justify the need for the detention deputies utilizing force, much less the force as described by both inmate Rogers and Ventura.

Third, the Court should examine the relationship between that need for applying force and the amount of force used.   As discussed above, there really was no need for the use of force since inmate Rogers was simply standing there awaiting his medical examination.   Nonetheless, no matter which way you look at it, there was no need to use the extent of force used by the detention deputies.

One can only imagine when ramming an inmate's head into a concrete wall while handcuffed and maced would be justified.

Fourth, the Court should then discuss what efforts were made by the detention deputies to temper the severity of the forceful response.   Interestingly, the detention deputies could have moved inmate Rogers to a cell away from D/D Noble, they could have shackled inmate Rogers' feet, could have required the assistance of more deputies, or utilized less life threatening weapons such as a taser or baton.   Anyone of the above scenarios would have been less severe than ramming inmate Rogers' skull into a concrete wall.   The problem is the detention deputies considered none of these less life threatening alternatives.

Finally, the Court should determine the extent of the threat to the safety and inmates as reasonably perceived by the responsible officials on the basis of the  facts known to them.   Inmate Rogers posed no threat to anyone at the time the physical abuse was inflicted.    For starters, inmate Rogers was handcuffed behind his back, maced in his eyes, and confined by five - six deputies.   The testimony reveals that Sgt. Barrett, D/D Odoski, D/D Renney, D/D Noble, Detective Davis, and Sgt. Gordon Brown were all present in the medical dorm. A reasonable police officer would not find these facts sufficient to justify ramming inmate Rogers head into the concrete wall multiple times, hiking up his handcuffs and arms, bending inmate Rogers' thumbs up, and kicking him in the legs.

In sum, when utilizing the 5-part <u>Whitley</u> test and simply taking the detention deputies comments about inmate Rogers will be going to the hospital along with D/D Noble establishes that the Defendants from an objective view

point intended to inflict force "maliciously and sadistically for the very purpose of causing harm".

The Defendants, Renney and Barrett, contend that no liability can be found upon them because there is no evidence that Renney and Barrett participated in the excessive force and abuse exercised upon inmate Rogers. This is not a correct statement of the law. An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance. Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002); see also, Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993), as amended, 14 F.3d 583 (11th Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force."); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) ("if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983"); Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985) ("an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance"); Harris v. Chanclor, 537 F.2d 203, 206 (5th Cir. 976) ("a supervisory officer is liable under [Section] 1983 if he refuses to intervene where his subordinates are beating an inmate in his presence").

Now that it has been determined that an Eighth Amendment violation has occurred the Court must determine whether the detention deputies violated a

clearly established right that a reasonable person should know.   Without rehashing the facts stated above in great detail, a reasonable officer should know not to ram an inmate's head into the concrete wall multiple times, hike up his handcuffs and arms, bend  his thumbs up trying to break them, and kick him in the legs while handcuffed behind his back, maced in the face, and having five other detention deputies present to assist in any potential control issues. The argument that beating a prisoner for noncompliance with a guard's orders after the prisoner had ceased to disobey or resist turns the "clearly established law" of excessive force on its head and changes the purpose of qualified immunity in excessive force cases from one of protection for the legitimate use of force into a shield for clearly illegal conduct. The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain. Whitley, **475 U.S. at 320-21, 106 S.Ct. 1078**. "This is so whether the prisoner is in a cell, prison yard, police car, in handcuffs on the side of the road, or in any other custodial setting.   The use of force must stop when the need for it to maintain or restore discipline no longer exists. Long before the defendants acted, the law was clearly established that correctional officers could not use force maliciously or sadistically for the very purpose of causing harm." Whitley, **475 U.S. at 320-21,106 S.Ct. 1078** and Skrtich v. Thornton, 280 F.3d at 1304-5.  Based upon the foregoing reasons, the qualified immunity defense fails as a matter of law.

_Section 1983 Claims -PCSO_

The Defendant, PCSO, attempts to escape liability from the section 1983 claims suggesting that there is no evidence of deliberate indifference to the Polk County Jail inmates.    Plaintiff suggests that there is a sufficient record of evidence to find otherwise. Officers in a civil rights action can be found liable for the failure to stop the abuse.  Where a § 1983 claim is based upon allegations of a government official's failure to properly supervise his employees, liability can be found upon a showing that such failure amounts to deliberate indifference to the legal rights of the persons with whom the employees came in contact because supervisory personnel cannot be held liable under § 1983 for the acts of their subordinates under the doctrine of _respondeat superior_.    Carter v. City of Philadelphia, **181 F.3d 339** (3d Cir.), cert denied, 528 U.S. 05(1999).

In City of Hialeah v. Fernandez, **661 So.2d 335** (Fla. 3d DCA 1995), the Third District aptly explained that, in order to establish deliberate indifference by a supervisor, the plaintiff is required to make a substantial showing:

> We have set forth three elements necessary to establish supervisory liability under § 1983: (1) that the  supervisor had actual or constructive knowledge that his  subordinate was engaged in conduct that posed "a  pervasive and unreasonable risk" of constitutional  injury to citizens like the plaintiff; (2) that the  supervisor's response to that knowledge was so  inadequate as to show "deliberate indifference to or  tacit authorization of the alleged offensive practices";  and (3) that there was an "affirmative causal link"  between the supervisor's inaction and the particular  constitutional injury suffered by the plaintiff.
>
> To satisfy the requirements of the first element, a  plaintiff must show the following:  (1) the supervisor's  knowledge of (2) conduct engaged in by a subordinate (3)  where the

conduct poses a pervasive and unreasonable risk of
constitutional injury to the plaintiff. Establishing a pervasive"
and "unreasonable" risk of harm requires evidence that the
conduct is widespread, or at least has been used on several
different occasions and that the conduct engaged in by the
subordinate poses an unreasonable risk of harm of
constitutional injury. A plaintiff may establish deliberate
indifference by demonstrating a supervisor's "continued
inaction in the face of documented widespread abuses."
The plaintiff assumes a heavy burden of proof in
establishing deliberate indifference because:

> [o]rdinarily, [the plaintiff] cannot satisfy his
> burden of proof by pointing to a single
> incident or isolated incidents, for a
> supervisor cannot be expected to
> promulgate rules and procedures covering
> every conceivable occurrence within the
> area of his responsibilities. Nor can he
> reasonably be expected to guard against the
> deliberate criminal acts of his properly
> trained employees when he has no basis
> upon which to anticipate the misconduct. A
> supervisor's continued inaction in the face of
> documented widespread abuses, however,
> provides an independent basis for finding he
> either was deliberately indifferent or
> acquiesced in the constitutionally
> offensive conduct of his subordinates.

Id. at 341-342 (quoting Shaw v. Stroud, **13 F.3d 791**, 799 (4th Cir. 1994)

(citations omitted)). *See also,* Brown v. Crawford, **906 F.2d 667**, 671 (11th Cir.

1990), cert. denied, 500 U.S. 933 (1991) (stating that a causal connection can be

established when a history of widespread abuse puts the responsible supervisor

on notice of the need to correct the alleged deprivation and he fails to do so; the

deprivations that constitute widespread abuse sufficient to notify the supervising

official must be obvious, flagrant, rampant, and of continued duration, rather than

isolated occurrences); Daniels v. Delaware, **120 F. Supp.2d 411**, 423 (D.C. DE

2000) (explaining that, in order to establish a § 1983 claim for failure to supervise

employees, a plaintiff must identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference, and demonstrate a close causal link between the alleged failure and the alleged injury).

The facts outlined above demonstrate that both D/D Odoski and Sgt. Barrett have been subjected two prior internal affairs investigations prior to this incident.    In addition, both D/D Odoski and Sgt. Barrett have been sued for excessive force  prior to this incident by Horace Hunter.   More importantly, there have actually been "founded" violations by Sgt. Barrett in the prior internal affairs investigation for excessive force and omitting material facts from her reports. Despite the foregoing, Sgt. Barrett was able to maintain her position as a supervisory officer without job termination or a demotion.   Essentially, the PCSO has not sufficiently punished either Sgt. Barrett or D/D Odoski to  deter the type of excessive force behavior that both have been involved in prior to this incident involving inmate Rogers. Had the PCSO properly disciplined either officer, or otherwise supervised these problem detention deputies to the degree that would prevent future attacks on inmates, then inmate Rogers would not have been attacked.   Based upon the foregoing, the summary judgment motion pertaining to the PCSO section 1983 claim should be denied.

### *Assault and Battery – Individual Defendants*

Defendants argue that no liability can be found against the individual detention deputies for assault and battery pursuant to section 768.28(9)(a), Florida Statutes unless the individuals acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights,

safety, or property."   Again without reiterating the facts discussed above, D/D Renney, D/D Odoski, and Sgt. Barrett's actions amount to a malicious purpose to injure inmate Rogers as retaliation for D/D Noble's injuries.   Moreover the Defendants' action also demonstrate a wanton and willful disregard of human rights, and more particularly inmate Rogers' right to be free from cruel and unusual punishment afforded to him from the Eighth Amendment.

### *Assault and Battery - PCSO*

The Defendant tries to have summary judgment entered for PCSO for the same reason as the individual Defendants.   That is a legal inconsistency.   The Counts for assault and battery alleged in the complaint are alternative claims. Thus, if the jury determines via a special verdict form that the assault and battery upon inmate Rogers was with bad faith, then the individual detention deputies are liable for assault and battery.   Conversely, if the jury determines via a special verdict form that the assault and battery upon inmate Rogers was *not* in bad faith, then the individual detention deputies are not liable for assault and battery but the Defendant PCSO is liable pursuant to section 768.28(9)(a), Florida Statutes.   A Plaintiff may allege inconsistent claims against the agency and the individual tortfeasor.   *See,* Johnson v. Dept. Health & Rehab. Serv., 695 So.2d 927 (Fla. 2d DCA 1997).   In Johnson, the Court stated

> The defendants also attacked the joinder of the individual defendants and the government entities in counts II, III, V, and VI of the complaint.   It is well established that under section **768.28**(9)(a), Florida Statutes (Supp. 1988), that "[i]n any given situation either the agency can be held liable under Florida law, or the employee, but not both." McGhee v. Volusia County, **679 So.2d 729**, 733 (Fla. 1996).   At the same time, a party may assert inconsistent claims in the same pleading. Fla. R. Civ. P. 1.110(g).   This remains true

when the claims are mutually exclusive. Rausch-Livingston Real
Estate v. Dixon, **260 So.2d 290** (Fla. 2d DCA 1972); see also
Maybin v. Thompson, **514 So.2d 1129** (Fla. 2d DCA 1987).
Johnson can therefore make claims against HRS and the City for
acts of Sackett and Clemento committed within the scope of their
employment and, in the alternative, pursue personal liability of
these defendants for acts "in bad faith or with malicious purpose or
in a manner exhibiting wanton and willful disregard of human
rights, safety or property." § **768.28**(9)(a), Fla. Stat. (Supp. 1988).
Johnson has pleaded these alternative theories. The problem, if
any, is that she has made the alternative allegations within the
same count of the complaint. While we think it a better practice to
have separated the alternative allegations in separate counts, we
do not find the manner in which the complaint is structured to be a
proper basis for dismissal.

Id. at 930-1. See also, Medberry v. McCallister, 937 So.2d 808 (Fla. 1st DCA

2006), and McGhee v. Volusia County, 679 So.2d 729 (Fla. 1996). Based upon

the foregoing the Defendant, PCSO, motion for summary judgment upon the

assault and battery claims must be denied.

### Negligence –PSCO

The Defendant PCSO argues that summary judgment should be granted

in its favor do to their being no evidence of negligent hiring, training, supervision,

and/or discipline of its detention deputies. That is simply untrue. The record

evidence also consists of the deposition of John G. Peters, Jr., Ph.D, the

Plaintiff's expert who testified that for purposes of training and supervision, the

PCSO does not provide sufficient performance evaluations of the deputies.

(Peter's depo, p. 55, line 24). The performance evaluations lump multiple

categories such as knowledge of orders, knowledge of directives, knowledge of

procedures, and knowledge of applicable laws into one rating criteria. (Peter's

depo, p. 57, line 6 -23). More importantly, there is nothing on the performance

evaluation to tell the rater what meets the appropriate standard for that criteria (i.e. nothing tells the rater what is the standard for the knowledge of directives that is expected from the detention deputy).  (Peter's depo, p. 57, l. 10).  Next, there are some criteria on the performance evaluation that do not pertain to all employees, so when you add up the points at the end of the evaluation how do you determine whether the deputy meets the acceptable standard.   The total number ultimately tells the rater nothing and renders the evaluation a "waste of time"  (Peter's depo, p. 57, l. 24 -  p. 58, l. 16) .   Also, the performance evaluations are not compared with other detention deputies to determine the norm for any particular category. (Peter's depo, p. 59, l. 15 – p. 61, l. 9).  Based upon the faulty performance evaluation forms for each detention deputy it misleads the Defendant PCSO in evaluating the history of officers who have been disciplined because of poor/deficient performance evaluations.  (Peter's depo, p. 63, l. 18-25).

Additionally, the facts also demonstrate that both D/D Odoski and Sgt. Barrett have been subjected two prior internal affairs investigations prior to this incident.   In addition, both D/D Odoski and Sgt. Barrett have been sued for excessive force prior to this incident by Horace Hunter.  More importantly, there have actually been "founded" violations by Sgt. Barrett in the prior internal affairs investigation for excessive force and omitting material facts from her reports. Despite the foregoing, Sgt. Barrett was able to maintain her position as a supervisory officer without job termination or a demotion.  Essentially, the PCSO has not sufficiently punished either Sgt. Barrett or D/D Odoski to deter the type of

excessive force behavior that both have been involved in prior to this incident involving inmate Rogers. Had the PCSO properly disciplined either officer, or otherwise supervised these problem detention deputies to the degree that would prevent future attacks on inmates, then inmate Rogers would not have been attacked. Based upon the foregoing, the summary judgment motion pertaining to the PCSO's negligence in supervising and disciplining its detention deputies should be denied.

### *False Imprisonment*

Finally, the Defendant moves for summary judgment as to Counts XX – XXV which are the false imprisonment claims under the theory that a convicted prisoner can never assert a false imprisonment claim. The elements of a cause of action for false imprisonment are "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or "color of authority" and 4) which is unreasonable and unwarranted under the circumstances. Montejo v. Martin Memorial Medical, 935 So.2d 1266 (Fla. 4th DCA 2006) *see also,* Johnson v. Weiner 19 So.2d 699, 700(1944); Jackson v. Navarro,665 So.2d 340, 341(Fla.4th DCA 1995); Everett v. Fla. Inst. of Tech., 503 So.2d 1382, 1383 (Fla. 5th DCA 1987); Kanner v. First Nat'l Bank of S. Miami, 287 So.2d 715, 717 (Fla. 3d DCA 1974).   There is nothing within the elements of false imprisonment which would prevent a prisoner from bringing forth the tort of false imprisonment. The Defendant is focusing on the fact that the Plaintiff was in incarcerated prisoner at the time of the tortuous actions, and therefore the Plaintiff could not possibly be "imprisoned" because he was already

sentenced to prison.   However, the thrust of the Plaintiff's false imprisonment claims is not that the Plaintiff falsely sentenced to prison, but rather the illegal handcuffing, torturing, making by the detention deputies while in prison.   The imprisonment alleged by the Plaintiff is not the location where the tortuous acts occurred (i.e. prison or jail) but instead the actions of the Defendant by improperly and illegally restraining the Plaintiff in order to torture the Plaintiff. Clearly these actions by the Defendant were an "unlawful detention and deprivation of liberty of a person"; "against the Plaintiff's will; without legal authority (to torture the Plaintiff); and 4) were unreasonable and unwarranted under the circumstances.   Without reciting the facts that are to be relied upon for purposes of a motion for summary judgment, each element has been met as a matter of law.   Therefore, the motion for summary judgment as to the false imprisonment claims should be denied as well.

## CONCLUSION

The summary judgment motion for each of the counts of the   Second Amended Complaint should be denied as a matter of law based upon the record evidence in the light most favorable to the Plaintiff.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 5, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jonathan B. Trohn, Esquire, Valenti Campbell Trohn Tamayo Aranda P.A., 1701 S. Florida Avenue, Lakeland, FL  33803, J.trohn@vcttalawyers.com.

**s/*Gregory P. Abaray, Esquire*
GREGORY P. ABARAY, ESQUIRE
Florida Bar # 0093017
Attorney for Plaintiff
Law Offices of Allen & Echemendia, P.A.
2920 Winter Lake Road
Lakeland, Florida 33803-9753
Tel:  (863) 669-9999
Fax:  (863) 669-1525
Greg@lakelandlegal.com